**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **Outleads Inc.,**<br>22 Franklin Place<br>Great Neck, NY 11023,<br><br>Plaintiff,<br><br>v.<br><br>**Salesforce, Inc.,**<br>415 Mission Street, 3rd Floor<br>San Francisco, CA 94105,<br><br>Defendant. | CIVIL ACTION NO.<br><br>COMPLAINT FOR PATENT INFRINGEMENT<br><br>**JURY TRIAL DEMANDED** |

As its Complaint in this action, Plaintiff Outleads Inc. ("Outleads"), by its undersigned attorneys, alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

## NATURE OF THE CASE

1. This is an action for infringement arising under the patent laws of the United States, Title 35, United States Code, of U.S. Patent No. 12,413,547 (Ex. A, "the '547 Patent"), U.S. Patent No. 12,363,061 (Ex. B, "the '061 Patent"), U.S. Patent No. 11,671,397 (Ex. C, "the '397 Patent"), U.S. Patent No. 10,798,046 (Ex. D, "the '046 Patent"), U.S. Patent No. 10,523,627 (Ex. E, "the '627 Patent"), U.S. Patent No. 9,491,249 (Ex. F, "the '249 Patent"), and U.S. Patent No. 9,342,843 (Ex. G, "the '843 Patent") (collectively, "the Asserted Patents"), owned by Outleads. *See* Exs. A-G. As set forth below, Defendant Salesforce, Inc. ("Salesforce") infringes the Asserted Patents by making, using, selling, and offering to sell the products and services covered by at least one claim of each of the Asserted Patents.

**THE PARTIES**

2. Outleads is a corporation organized and existing under the laws of New York, having a principal place of business at 22 Franklin Place, Great Neck, NY 11023.

3. On information and belief, Salesforce is a corporation organized under the laws of the State of Delaware with an address at 415 Mission Street, 3rd Floor, San Francisco, CA 94105.

**JURISDICTION AND VENUE**

4. This action arises under the patent laws of the United States, Title 35 U.S.C. §§ 1 *et seq.* This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b), 2201, and 2202.

5. On information and belief, this Court has personal jurisdiction over Salesforce because Salesforce has established minimum contacts with the forum such that the exercise of personal jurisdiction over Salesforce will not offend traditional notions of fair play and substantial justice.

6. On information and belief, Salesforce has regularly and purposefully availed itself of the privilege of conducting business activities within Virginia and this District. On information and belief, Salesforce has purposefully availed itself of the rights and benefits of Virginia law and has engaged in systematic and continuous contacts with Virginia. On information and belief, Salesforce derives substantial revenue from the sale of infringing products and/or services in Virginia and has availed itself of the privilege of conducting business within Virginia.

7. On information and belief, personal jurisdiction is proper because Salesforce has committed acts of infringement in this District. This Court has personal jurisdiction over Salesforce because, *inter alia*, this action arises from activities Salesforce directed towards Virginia.

8. Exercising personal jurisdiction over Salesforce in this District would not be unreasonable given Salesforce's contacts in this District, the interest of this District in resolving

disputes related to products and/or services sold herein, and the harm that Salesforce's infringement causes to Outleads.

9. For these reasons and for other reasons that will be presented to the Court if jurisdiction is challenged, the Court has personal jurisdiction over Salesforce.

10. Venue is proper under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b) because Outleads is being harmed in this District; Salesforce is doing business in this District, including through offices in McLean, Virginia and Herndon, Virginia, and data centers in Northern Virginia; Salesforce has regularly and purposefully availed itself of the privilege of conducting business activities within Virginia and this District; Salesforce is infringing the Asserted Patents in connection with products and services provided to or from Virginia and this District; and this action arises from activities Salesforce directed towards Virginia and this District.

11. Salesforce's McLean office is located at 8280 Greensboro Drive, McLean, Virginia 22102, and on information and belief performs functions related to at least sales and technical support.[1] The McLean office spans at least two office floors, floors three and four.[2]

**McLean, VA**
8280 Greensboro Dr.
4th Floor
McLean, VA 22102
Phone: 1-800-664-9073
Contact Sales
Office Accessibility
Contact Technical Support

12. The outside of the McLean office is pictured below:[3]

[1] https://www.salesforce.com/company/locations/
[2] https://www.salesforce.com/company/mclean-office-accessibility/
[3] https://www.google.com/maps/place/8280+Greensboro+Dr,+McLean,+VA+22102




13. In addition, Salesforce maintains a presence in Herndon, Virginia, and has recently sought to hire for that location.[4] Salesforce confirms its Herndon presence on its website:[5]

[4] https://www.indeed.com/q-salesforce-l-herndon,-va-jobs.html?vjk=f8efbd48ad2af045
[5] https://www.salesforce.com/company/careers/jobs/jr342302/customer-success-manager-core-sales-service-clouds-missionforce-tssci-clearance/

**Customer Success Manager - Core (Sales & Service) Clouds - Missionforce - TS/SCI Clearance**

Customer Success

District of Columbia - Washington
Virginia - Mclean
Maryland - Washington DC Metro - Remote
Virginia - Herndon

14. Salesforce employees based at its McLean and Herndon locations span a variety of job functions. Examples of job titles of Salesforce employees working in McLean or Herndon include Software Engineer; Lead Software Engineer; Software Developer; Lead Distributed System Software Engineer; Software Engineering Architect; Devops Lead; Vice President of Database Engineering; User Experience Architect; Data Integration Architect; Analytics Technical Architect; Security Engineer; Principal Network Engineer; Lead Infrastructure Engineer; Lead Infrastructure Security Engineer; Director of Enterprise Architecture; Vice President Solution Engineering; Platform Expert; Senior Manager – Data Science & Analytics Consulting; Analytics Consulting Leader; Technical Architect; Lead Product Designer; Senior Director, Salesforce Certified Technical Architect; Solutions Architect; Solutions Engineer; Senior Solution Engineer; Principal Solution Engineer; Distinguished Strategic Solution Engineer; Director, Technical Consulting; Senior Manager, Technical Consulting; Director, Business Strategy; Vice President of Product; Senior Business Architect; Senior Manager, Customer Success; Account Executive; Area Vice President of Sales; Director of Sales Analytics; Vice President of Sales; Regional Vice President; President, Global Public Sector; Regional Vice President – Federal; and Senior Vice

President, CRM, Mission & Stakeholder Engagement Platforms. Based on information and belief, Salesforce employees having these roles develop and/or support the technologies accused of infringement in this case, and are knowledgeable about business and financial factors affecting recoverable damages from such infringement.

15. Upon information and belief, employees at Salesforce's McLean office have specialized knowledge related to the infringing technologies at issue in this case, such as Web-to-Lead and Web-to-Case technologies. For example, Salesforce has hired for employees in the McLean office and included job requirements of "Familiarity with Sales Cloud automation (workflows, process builder, flows for sales processes) and Service Cloud automation (email-to-case, web-to-case, case assignment rules, macros)."[6]

16. In addition to its McLean and Herndon locations, Salesforce also maintains a continuous and systematic presence in the Eastern District of Virginia through infringing cloud infrastructure and data-center operations located in Northern Virginia. Salesforce operates infringing "Salesforce-managed data centers" in "Virginia, United States," including separate "Virginia North" and "Virginia South" locations[7]:

We have Salesforce-managed data centers in the following metropolitan areas:

- Amsterdam, Netherlands (NL)
- Stockholm, Sweden (SE)
- Tokyo, Japan (JPN)
- Osaka, Japan (JPN)
- Virginia, United States (USA):
  - Virginia North
  - Virginia South

[6] https://www.salesforce.com/company/careers/jobs/jr342302/customer-success-manager-core-sales-service-clouds-missionforce-tssci-clearance/
[7] https://help.salesforce.com/s/articleView?id=000396845&type=1

17. Salesforce further represents that its Hyperforce instances for the United States are served from AWS's "US East (N. Virginia)" region.[8] Upon information and belief, Salesforce's infringing Web-to-Lead and Web-to-Case technologies operate on Salesforce-managed data centers or on Hyperforce instances within this judicial District.

## OUTLEADS'S INNOVATIVE BUSINESS AND INTELLECTUAL PROPERTY

18. Dorin Rosenshine graduated from Baruch College in 2008 and began working for marketing and advertising brokerage companies where she gained valuable experience in online marketing and advertising. During this time, she also taught herself how to code and managed Google AdWords (now called Google Ads) activity and applications for small businesses. Ms. Rosenshine quickly discovered that these businesses could not combine online (e.g., web tracking) data with offline (e.g., customer relations management) data in an efficient or accurate manner and without compromising data privacy.

19. Founded in 2014 by Ms. Rosenshine, Outleads provides pioneering technologies for integrating Customer Relationship Management (CRM) data with various types of web analytics data. The existing network architectures treated customer offline activity (such as inbound telephone calls or offline CRM status updates) and online digital footprints (such as those tracked via Internet cookies) as isolated, orphaned network entities. '061 Patent, 2:23-57. For example, online commerce systems operated via stateless HTTP protocols only partially able to anonymously track users through temporary browser cookies and IDs. '061 Patent, 2:18-31; 13:5-38 (contrasting the structural divide between stateful offline nodes and stateless HTTP protocols); Fig. 13.

---

[8] https://help.salesforce.com/s/articleView?id=000396845&language=en_US&type=1

20. With these technical problems in mind, Ms. Rosenshine developed software bridging the gap between web tracking platforms and online customer relations management platforms using a new, specific network architecture. This innovative software and new network architecture formed the foundation of Outleads, which soon won a spot in the prestigious Microsoft Ventures accelerator with a $25,000 grant and co-working space located in Seattle, Washington. With these resources, Ms. Rosenshine continued to develop Outleads's software and capabilities.

21. Appreciating her inventions were prone to copying, Ms. Rosenshine spent precious early startup time and funds formally reducing her techniques to writing and filing patent applications to protect them. Once the applications were filed, and to confirm the viability of her software, Ms. Rosenshine attended conferences to generate interest in her software. At one of these conferences, Direct Marketing Association (DMA), Ms. Rosenshine was part of the &THEN Hot Zone competition.

22. On information and belief, organizers of the DMA conference reside in this judicial District and have information relevant to this action.

23. At the DMA conference, Ms. Rosenshine operated a booth for Outleads. At this booth, Ms. Rosenshine provided a demonstration and brochure of her product. *See* Ex. H. This brochure described Outleads's technology and its improvements over industry competitors. *See id.* It also described Outleads's technology as "patented." *Id.* at 1.

24. As part of this competition, Ms. Rosenshine was paired with Liam Doyle, Vice President of Advertising Products for Salesforce at the time. Mr. Doyle had been designated as a judge assessing Outleads in the &THEN Hot Zone competition. As a judge, Mr. Doyle received explanations of Outleads's patented technology and how it operated, including that the technology was patented. *See id.* Ms. Rosenshine also met with Mr. Doyle at least once leading up to the

conference. During these meetings, Ms. Rosenshine discussed her business model and the technology disclosed in her patent applications.

25. Around this time, Outleads presented at the 2016 Contact.io conference and gained the attention of Genesys, the world's largest provider of contact center software. Genesys partnered with Outleads to develop a specialized solution for call centers. Specifically, Outleads provided the Google Analytics plugin for the Genesys AppFoundry. On information and belief, Genesys employees with knowledge of Outleads's specialized technology and Outleads's reputation in the industry reside in this District.

26. Ms. Rosenshine continued to present Outleads's technology described in its patent applications at conferences. At these conferences, Outleads continued to receive praise for its innovative technology. Outleads was also featured in several articles highlighting its ability to integrate form submissions and phone calls with existing client systems. Exs. I, J, K.

27. But over time, Ms. Rosenshine noticed that other companies, including in particular Salesforce, had begun implementing her techniques in their own products. Indeed, only after the DMA conference where Salesforce's Mr. Doyle judged Outleads and its technology did Salesforce begin replicating Ms. Rosenshine's patented technology through Salesforce's own CRM system.

28. Today, Outleads's patented technology continues to address the structural inability of independent, asynchronous networks to natively associate offline events with online digital sessions. Outleads had pioneered the field with its groundbreaking network architectures and anonymous data enhancement techniques that bridged the technological divide between offline CRM/telephonic networks and "stateless" online web-analytics servers. In doing so, Outleads also overcame technological challenges and realized technological benefits pertaining to user and data privacy, enrichment of disparate CRM data types and sources, and enhanced tracking and

attribution for online web activity. Unfortunately, while Salesforce and others immediately recognized the benefits of Outleads's technology, copying of Outleads's patented techniques became increasingly problematic over time.

**SALESFORCE'S KNOWLEDGE OF OUTLEADS'S INTELLECTUAL PROPERTY**

29. In 2014, Ms. Rosenshine on behalf of Outleads, applied to join the Salesforce ISV program. Ms. Rosenshine submitted an "ISV Business Summary" form as part of that application process. In response to an application question "15- Who are your competitors?", Ms. Rosenshine wrote "There are several call-tracking companies, but *our patent-pending technology* is exclusive in the market." (emphasis added). Ex. L at 2-3. In response to question "16- What are your strengths/weaknesses in terms of go to market?", Ms. Rosenshine again referenced Outleads's pending patents, explaining "[o]ur unique, patent-pending product is getting a lot of interest and a few companies have already asked us about integrating with Salesforce. At the same time, we're a small team with limited resources, which makes fast growth challenging." *Id.*

30. Salesforce's website provides answers to questions about becoming a Salesforce Partner.[9] The website explains that a Partner "application will undergo a Partner Operations review and be passed to our Legal team for a final sign off. Once these approvals are complete, your partnership will be activated and your company will be a Provisional Partner."[10] On information and belief, members of Salesforce's legal team reviewed Ms. Rosenshine's application to join the Salesforce SIV program, including the statements in that application relating to Outleads's pending patent applications.

31. On information and belief, Salesforce employees, including but not limited to Liam Doyle, then Vice President of Advertising Products for Salesforce, attended the October 2015

[9] https://www.salesforce.com/partners/become-a-partner/
[10] *Id.*

&THEN Hot Zone competition. Mr. Doyle became aware of Outleads's technology at the &THEN Hot Zone competition. Ms. Rosenshine also widely distributed brochures at the 2015 &THEN Hot Zone competition that explained "Outleads' patented technology enables delivery of a targeted ad." Ex. H at 1. On information and belief, Mr. Doyle received information about Outleads's technology and how it operated, including that the technology was patented, from reviewing the Outleads competition materials and brochures referencing Outleads's "patented technology."

32. Through its review of the Outleads ISV Business Application submitted in 2014, Salesforce has or should have knowledge of Outleads's then-pending patent portfolio, which now includes the Asserted Patents. Additionally, Salesforce has or should have knowledge of Outleads's patent portfolio based on the foregoing facts, including its published applications and the subsequently issued Asserted Patents.

33. In addition, Salesforce has actual knowledge of the Asserted Patents at least as of the date of the filing of this complaint.

34. Outleads complies and has complied with the requirements of 35 U.S.C. § 287(a) for the Asserted Patents. Outleads has a practice of marking its products, including by publishing patent numbers associated with its patented technology on its website, www.outleads.com.

**SALESFORCE AND ITS USE OF OUTLEADS'S INTELLECTUAL PROPERTY**

35. Salesforce was founded in 1999 as a software-as-a-service company. Salesforce markets itself as the #1 AI CRM.[11] Salesforce offers a CRM system, which includes various CRM databases. Salesforce ingests or otherwise links to website tracking data from tracking systems like its own Experience Cloud, as well as Google, Facebook, and Microsoft. This data is then associated with stored CRM data to enrich customer data records.

[11] https://www.salesforce.com/

36. In Salesforce's systems, web analytics data is uniquely linked to CRM data via a user-level identifier, such as a Client ID generated by Google (e.g., Google Analytics Client ID), UUID generated by Salesforce Experience Cloud, as well as other identifiers generated when a user visits a website by Microsoft, Facebook, or other entities. These identifiers are unique parameters typically stored on a user's device. When a potential customer visits a website or subsequently fills out a Web-to-Lead or Web-to-Case form on a company's website, this unique identifier can be captured and stored within the corresponding customer's record in Salesforce. Salesforce uses this identifier (sometimes linked with a Salesforce identifier) to integrate and enrich CRM data pertaining to customers. The identifiers are also used to communicate Salesforce data to external systems, such as Google Analytics.

37. Salesforce has and continues to make, use, sell, and/or offer to sell in the United States Accused Products infringing the claims of the Asserted Patents. By way of nonlimiting example, the Accused Products include Salesforce's Web-to-Lead and Web-to-Case technologies, which link, harmonize, and enrich CRM data and support the Salesforce platform, as well as the agents, platforms, and other technologies that leverage such enriched data.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 12,413,547

38. Outleads repeats and realleges the foregoing paragraphs as if fully set forth herein.

39. On September 9, 2025, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '547 Patent, titled "System for Associating Offline Data with Online Activity."

40. The '547 Patent is valid and enforceable.

41. The '547 Patent addresses shortcomings in network architectures that treated user interactions by mobile devices, desktop devices, and landline phones as isolated, orphaned network events. '547 Patent, 2:14-45. Other efforts to track these fragmented touch points across networks

involved forcing the user to login or passing insecure transmissions of PII across multiple scripts, further increasing data collision and network tracking failures. *Id.*, 2:46-3:50. For example, network systems used brute-force hardware scaling (e.g., provisioning and maintaining massive pools of proxy forwarding phone numbers) or highly latent data manipulation (e.g., manual downloading, hashing PII such as email addresses, and executing static multi-day batch uploads). *Id.*, 2:46-3:50.

42. Other network architectures also suffered from network bottlenecks and massive data loss when offline PII did not sufficiently match the hashed data stored in the digital network. *Id.*, 3:7-14. Remote analytics and ad-serving algorithms thus remained functionally blind and static until the next multi-day batch upload, wasting vital computational resources and network bandwidth serving digital impressions to unqualified offline leads. *Id.*, 3:15-24, 3:35-50.

43. The ’547 Patent and its claims resolve these data collision and matching failures of other network systems by introducing a specific network architecture that natively resolves the offline-to-online identity gap and avoids reliance on intermediate PII hashing or massive proxy number pools. *Id.*, 2:55-63, 3:55-4:38, 5:32-6:55, 51:43-56:24, Abstract. For example, the ’547 Patent introduces a tracking server that utilizes an ensuing offline activity (e.g., an inbound telephonic trigger or CRM update acting as an offline source) to programmatically bind that stateful offline data directly to an anonymous user-level identifier associated with the user’s web session. *Id.*, 4:24-8, 23:23-24:16, 51:44-52:4, Fig. 10 ([364], [376]). The tracking server utilizes offline activity (e.g., an inbound telephonic trigger or CRM update acting as an offline source) to programmatically bind that stateful offline data directly to an anonymous user-level identifier associated with the user’s web session. *Id.*, 4:24-38, 23:23-24:16, 51:45-52:4, Fig. 10 (364, 376). The claims describe that this “additional source” of information is not a cookie from the website

visit (i.e., not derived from the website's own tracking cookie), underscoring that the system leverages truly external offline data for linking, harmonizing, and enriching CRM data. *See, e.g.*, *id.*, 51:56-58.

44. The '547 Patent thus avoided the industry's deficient reliance on cross-referencing hashed databases and static uploads by programmatically pushing offline activities directly back to a web analytics server as discrete, anonymous, digital events. To do so, the '547 Patent altered how the respective network servers construct and store tracking profiles. Unlike generic batch-upload systems, the '547 Patent structurally merges fragmented offline records using a tracking server to create a singular, cohesive digital architecture. *Id.*, 4:10-23, 23:54-24:4, 49:65-51:20, Fig. 39.

45. The '547 Patent also improves computational efficiency and data integrity of the server system. By dynamically resolving offline and online activity natively (for instance, at the API level), the network avoids latency, match-rate failures, and bandwidth degradation associated with repetitive multi-day batch uploads in the existing architecture. *Id.*, 3:7-24, 4:1-23, 12:41-64, 22:41-64. Such deterministic processing optimizes the real-time performance of remote analytics servers, avoiding wasted computational resources in serving digital ads to disqualified offline leads. *Id.*, 4:10-38, 50:56-51:20.

46. The '547 Patent further claims a highly flexible, API-driven architecture that accommodates decoupled cloud environments and headless microservices. The tracking system passively ingests digital identifiers and form data, avoiding active front-end monitoring and browser-level event triggers. Furthermore, the '547 Patent enables outbound data resolution through API-enabled communication of the enriched tracking data instead of active data transmissions. These structural refinements effectively align the '547 Patent claims with scalable,

API-first middleware and asynchronous data integrations that have become common since in today's software-as-a-service ecosystem. The '547 Patent thus also solved the computer-centric "broken identity" problem inherent in 2013's decentralized Internet protocols while also improving the server system's performance.

47. The '547 Patent also includes dependent claims that further describe a specific centralized system architecture. For example, dependent claim 4 further establishes a centralized architecture where the tracker server acts as a centralized controller for the data collection lifecycle. The system utilizes an automated mechanism to append new information at acquisition or receipt, ensuring data integrity that manual or batch-processed prior art systems could not achieve. *Id.*, 2:35-45, 2:46-63, 3:15-24, 3:35-50.

48. The prosecution history confirms the '547 Patent improves upon network system architectures and functionalities, with their privacy-compromising data tracking technology, by disclosing and claiming a truly anonymous system capable of enhancing tracking data in real time. As with its predecessor '061 Patent, the USPTO did not issue any rejection for subject matter eligibility during examination of the '547 application. Instead, the Examiner focused on prior art rejections and allowed the '547 Patent after the applicant amended the independent claims to reinforce that the data enrichment of "additional information" involves a source other than the website visit (i.e., not from cookie-based web tracking) and that the recipient computer system actively formats the enriched data provided by the tracking server to the recipient system. '547 Patent Prosecution History, Amendment and Response to Office Action filed April 23, 2025.

49. The Examiner's Reasons for Allowance again specifically recognized that the '547 Patent disclosed and claimed an unconventional solution to the shortcomings in prior architectures:

> The prior arts of record fail to provide (or render obvious, alone or in combination) the component, relationship/structure, functionalities and mode of operation for a user activity tracking system which comprises a tracker server computer in communication with Internet and tracker software running on the tracker server computer to perform multiple actions as set forth in the independent claims as the whole.

'547 Patent Prosecution History, Notice of Allowance issued May 15, 2025.

50. The prosecution history thus confirms that, unlike network systems relying on insecure "authenticated identification" (which exposed PII via cookies), the '547 Patent claims utilize improved techniques that further structurally protect user privacy and prevent data leaks with a new framework for using truly anonymous user-level identifiers and real-time data synchronization.

51. Outleads holds all rights, title, and interest in and to the '547 Patent, including the right to bring this suit and recover all past, present, and future damages for infringement of the '547 Patent. Salesforce is not licensed to the '547 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '547 Patent whatsoever. As such, Salesforce's infringement described below has injured, and continues to injure, Plaintiff.

52. Salesforce, in violation of 35 U.S.C. § 271, has directly infringed and continues to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '547 Patent by making, using, offering to sell, and/or selling in the United States without authority, products, equipment, software, and/or services, including without limitation, the Accused Products, including Salesforce's Web-to-Lead and Web-to-Case services, that practice at least claim 1 of the '547 Patent. Salesforce's infringement of the '547 Patent arises from its own actions.

Salesforce's infringement also arises from its actions alone, or jointly with one or more partners (or third parties), as an agent, pursuant to a joint enterprise, or an equivalent arrangement. A claim chart setting forth certain nonlimiting examples of Salesforce's infringement accompanies this Complaint as Exhibit M, herein incorporated by reference.

53. Any act(s) performed by one or more entities other than Salesforce and involved in the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a), is/are attributable to Salesforce. Salesforce has acted and continues to act as an agent on behalf of such entities. Salesforce has formed a joint enterprise with one or more such entities, and together, Salesforce and such entity/entities make, use, offer to sell, and/or sell the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have entered into an agreement(s), express or implied, related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a common purpose related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a community of pecuniary interest related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a).[12, 13, 14] And Salesforce and such entity/entities each have had an equal voice in the direction of the enterprise related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Unless

[12] https://www.salesforce.com/news/press-releases/2017/11/06/salesforce-and-google-form-new-strategic-partnership/#:~:text=SAN%20FRANCISCO%E2%80%93DREAMFORCE%202017%E2%80%94November,more%20collaborative%20experiences%20for%20customers.
[13] https://www.salesforce.com/news/press-releases/2023/09/12/salesforce-google-workspace-ai-partnership/
[14] https://www.salesforce.com/news/press-releases/2025/02/24/google-partnership-expansion-gemini-agentforce/

enjoined by this Court and ordered to discontinue such infringing activities, Salesforce will continue to infringe Outleads's patent rights under the Asserted Patents in violation of 35 U.S.C. § 271(a).

54. Salesforce has indirectly infringed and continues to indirectly infringe at least claim 1 of the '547 Patent under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, and with knowledge in accordance with the allegations of ¶¶ 29-37, knowingly and intentionally inducing others to directly infringe the '547 Patent. On information and belief, past users of the Accused Products directly infringed at least claim 1 of the '547 Patent when they used the Accused Products for such products' ordinary, customary, and intended use, and, in particular, used Salesforce's Web-to-Lead and Web-to-Case services in the directly infringing manner described in Exhibit M hereto. On information and belief, Salesforce's affirmative acts of inducement included, without limitation and with specific intent to encourage the infringement, having knowingly induced customers to use the Accused Products within the United States in the ordinary, customary, and intended way, and in particular, in the directly infringing manner described in Exhibit M hereto, by, directly or through intermediaries, having supplied such Accused Products to customers within the United States and having instructed and encouraged such customers how to use the Accused Products in the ordinary, customary, and intended way, and, in particular, in the directly infringing manner described in Exhibit M hereto, which Salesforce knew or should have known infringed at least claim 1 of the '547 Patent. Salesforce's affirmative acts of inducement further included, without limitation and with specific intent to encourage the infringement, any one or a combination of encouraging and/or facilitating third-party infringement through having advertised, marketed, and disseminated the Accused Products and components thereof; and having created, published and/or provided sales, promotional, and marketing

materials, supporting materials, product manuals, user guides, and/or technical support and other information relating to the Accused Products and functionality thereof. A specific, non-limiting example of said publications include instructions on generating and testing web-to-case forms provided by Salesforce:



## Generate and Test Your Web-to-Case Form

Generate HTML code that can be inserted into your company's website to capture cases in a web form. Whenever someone submits information using the form, a case is created.

REQUIRED EDITIONS

View supported editions.

| USER PERMISSIONS NEEDED | |
|---|---|
| To set up Web-to-Case: | Customize Application |
| To generate Web-to-Case HTML | Customize Application |

1. Complete the steps in Prepare for Web-to-Case and Turn On and Customize Web-to-Case.
2. From Setup, enter `Web-to-Case HTML Generator` in the Quick Find box, then select **Web-to-Case HTML Generator**.
3. Select the fields to include on your Web-to-Case form.
4. If your organization has a self-service portal and you want web-generated cases to be visible to portal users, select **Visible in Self-Service Portal**.
5. Specify the complete URL to which customers are directed after they submit their information. For example, the URL can be for a "thank you" page or your company's home page.
6. If **Require ReCAPTCHA Verification** is selected on the Web-to-Case page in Setup, complete the reCAPTCHA fields. If you select that option after having already generated the HTML code, generate the code again to ensure that it includes the reCAPTCHA validation code.
   a. Leave **Include reCAPTCHA in HTML** selected.
   b. Enter the key pair that you obtained from Google and registered on the Salesforce Platform. Use the pair that is already registered on the Salesforce Platform.
   c. Leave **Enable Server Fallback** selected to prevent the loss of case traffic. If the Google reCAPTCHA offline and spam filtering isn't available, this setting allows all case traffic through.



[15]

55. Salesforce has contributed to the infringement of, and continues to contribute to the infringement, either literally and/or under the doctrine of equivalents, of, at least claim 1 of the '547 Patent under 35 U.S.C. § 271 by selling, offering to sell, making, and/or using within or into the United States the Accused Products. Salesforce's contributory infringement included, without limitation, Salesforce's sale and provision of the Accused Products to customers in the United States for use in practicing at least claim 1 of the '547 Patent. The Accused Products constitute at least a material part of the invention of the '547 Patent, are known by Salesforce to be especially made or adapted for use in infringing the '547 Patent when used for their normal and

[15] https://help.salesforce.com/s/articleView?id=service.web_to_case_html.htm&type=5

intended purpose, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

56. Salesforce had actual or constructive knowledge, or was willfully blind to, the existence of Outleads's patent rights in accordance with the allegations of ¶¶ 29-37; knew or should have known that the advertisement, offer for sale, sale, and/or the facilitation of sales of the Accused Products would induce infringement of at least claim 1 of the '547 Patent; and/or had a subjective belief that others including end users, infringe the '547 Patent, but remained willfully blind to the infringement.

57. Despite this knowledge, Salesforce continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Salesforce. Thus, Salesforce's infringement has been, and continues to be, willful and deliberate.

58. Outleads is entitled to recover damages under 35 U.S.C. § 284 to adequately compensate for Salesforce's infringement. Salesforce's ongoing infringement is willful and deliberate, as Salesforce became aware of the infringing nature of the Accused Products at least by virtue of the allegations of ¶¶ 29-37. Despite having actual knowledge of the '547 Patent, Salesforce has continued its infringing activities.

59. Outleads has been and continues to be damaged and irreparably harmed by Salesforce's infringement of the '547 Patent. This irreparable harm will continue unless this Court enjoins Salesforce.

60. Salesforce's conduct in infringing the '547 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

**COUNT II: INFRINGEMENT OF U.S. PATENT NO. 12,363,061**

61. Outleads repeats and realleges the foregoing paragraphs as if fully set forth herein.

62. On July 15, 2025, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '061 Patent, titled "System for Associating Offline Data with Online Activity."

63. The '061 Patent is valid and enforceable.

64. The '061 Patent addresses shortcomings in network architectures that treated user interactions by mobile devices, desktop devices, landline phones, and CRM systems as isolated, orphaned network events. '061 Patent, 2:8-39. Other efforts to track these fragmented touch points across networks involved forcing the user to login or passing insecure transmissions of Personally Identifiable Information (PII) across multiple scripts, further increasing data collision and network tracking failures. *Id.*, 2:40-3:44. For example, other systems used brute-force hardware scaling (e.g., provisioning and maintaining massive pools of proxy forwarding phone numbers) or highly latent data manipulation (e.g., manual downloading, hashing PII such as email addresses, and executing static multi-day batch uploads). *Id.*, 2:40-3:44.

65. Network architectures also suffered from network bottlenecks and massive data loss when offline PII did not sufficiently match the hashed data stored in the digital network. *Id.*, 2:40-3:8. Remote analytics and ad-serving algorithms thus remained either static until the next multi-day batch upload or functionally blind, wasting vital computational resources and network bandwidth serving digital impressions to unqualified offline leads. *Id.*, 3:9-18, 3:29-44.

66. The '061 Patent and its claims resolve these data collision and matching failures of network systems by introducing a specific network architecture that natively resolves the offline-to-online identity gap and avoids reliance on intermediate PII hashing or massive proxy number pools. *Id.*, 2:49-57, 3:49-4:31, 5:25-6:28, 51:33-55:8, Abstract. For example, the '061 Patent introduces a tracking server that, upon notice of a website visit, obtains a user-level identifier and

creates a user activity record containing data submitted from a digital form. *Id.*, 4:17-31, 23:14-24:7, 51:34-62, Fig. 10 (364, 376). The tracking server utilizes offline activity (e.g., an inbound telephonic trigger or CRM update acting as an offline source) to programmatically bind that stateful offline data directly to an anonymous user-level identifier associated with the user's web session. *Id.*, 4:17-31, 23:14-24:7, 51:34-62, Fig. 10 (364, 376). The claims describe that this "additional source" of information is not a cookie from the website visit (i.e., not derived from the website's own tracking cookie), underscoring that the system leverages truly external offline data for linking, harmonizing, and enriching CRM data. *See, e.g.*, *id.*, 51:46-49.

67. The '061 Patent thus avoided the industry's deficient reliance on cross-referencing hashed databases and static uploads by having the tracker server actively transmit the matched online/offline data. In particular, the tracker programmatically pushes the user's unique identifier and the parsed additional information directly back to the receiving system as discrete, anonymous, digital events. By shifting data transfer to the tracker, the '061 Patent altered how the respective network servers construct and store tracking profiles. Unlike generic batch-upload systems, the '061 Patent structurally merges fragmented offline records using a tracking server to create a singular, cohesive digital architecture. *Id.*, 4:4-16, 23:45-62, 49:56-51:10, Fig. 39.

68. The '061 Patent also improves the real-time computational efficiency and data integrity of the server system. By dynamically resolving offline and online activity natively and in real time, the network avoids latency, match-rate failure, and bandwidth degradation consequences associated with repetitive multi-day batch uploads in the existing architecture. *Id.*, 3:1-19, 4:4-16, 12:20-39, 22:32-55. Such deterministic processing optimizes the real-time performance of remote analytics servers, avoiding wasted computational resources in serving digital ads to disqualified offline leads. *Id.*, 4:4-31, 50:47-51:10.

69. Dependent claim 4 further describes the claimed architectural mechanism to integrate offline, agent-entered data, allowing the tracking server to acquire and append information (e.g., CRM data) into a unified digital record identified by the same record ID associated with the user's online activity. This configuration bridges another gap between offline interactions—such as post-submission updates or agent-entered outcomes—and online tracking systems that would otherwise remain blind to such offline actions. *Id.*, 3:23-44.

70. The '061 Patent also includes dependent claims that further describe the claimed architecture with functionality unavailable in prior systems. In particular, dependent claims 6 and 8 require the tracking server to dynamically characterize a user—by communicating user characterization data such as interests, lifestyle attributes, or affinities—to downstream advertising or analytics platforms, which then use that characterization to target subsequent online experiences in real time, producing richer data sets that are fed back into the system. This ordered combination recites a specific structural feedback loop between the tracker and advertising platforms that alters how the network operates.

71. The '061 Patent thus solved the computer-centric "broken identity" problem inherent in 2013 to decentralized internet protocols while improving the server system's performance. Instead of forcing user logins or exposing vulnerable PII, the '061 Patent introduced a tracking server to enforce its specific architectural rules for securely, anonymously capturing and binding fragmented tracking and stateless browser footprints natively. *Id.*, 4:4-31, 12:20-38. By actively obtaining a unique tracking identifier during each web session and immediately linking it with subsequent offline interactions, the system achieves a secure, unified view of network and other activity without relying on other, privacy-compromising methods.

72. The prosecution history confirms the ’061 Patent improves upon network system architectures and functionalities, with their privacy-compromising data tracking technology, by disclosing and claiming a truly anonymous system capable of enhancing tracking data in real-time. Because the ’061 Patent claims specific technical improvements, the USPTO did not issue a single rejection regarding subject matter eligibility during its rigorous two-year examination. Instead, the Examiner allowed the ’061 Patent upon receiving clarifying amendments across the independent claims confirming the association of user-level identifiers with user activity records and the way enriched data becomes directly interfaced with the tracking server. ’061 Patent Prosecution History, Notice of Allowance issued March 12, 2025. The Examiner noted that “the substance of the Applicant’s Remarks filed 02/26/2025 point out the reason claims are patentable over the prior art of record.” *Id.*

73. The Examiner’s allowance recognized the ’061 Patent claims provide an unconventional solution to shortcomings found in network architectures through a tracking server that leverages anonymous user-level identifiers to securely associate offline interactions with online profiles. *Id.* The prosecution history thus likewise confirms that, unlike other network systems relying on insecure “authenticated identification”—which exposed PII via cookies—the ’061 Patent claims utilize improved techniques that structurally protect user privacy and prevent data leaks. *Id.*

74. Outleads holds all rights, title, and interest in and to the ’061 Patent, including the right to bring this suit and recover all past, present, and future damages for infringement of the ’061 Patent. Salesforce is not licensed to the ’061 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the ’061 Patent whatsoever. As such, Salesforce’s infringement described below has injured, and continues to injure, Outleads.

75. Salesforce, in violation of 35 U.S.C. § 271, has directly infringed and continues to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the ’061 Patent by making, using, offering to sell, and/or selling in the United States without authority, products, equipment, software, and/or services, including without limitation, the Accused Products, including Salesforce’s Web-to-Lead and Web-to-Case services, that practice at least claim 1 of the ’061 Patent. Salesforce’s infringement of the ’061 Patent arises from its own actions. Salesforce’s infringement also arises from its actions alone, or jointly with one or more partners (or third parties), as an agent, pursuant to a joint enterprise, or an equivalent arrangement. A claim chart setting forth certain nonlimiting examples of Salesforce’s infringement accompanies this Complaint as Exhibit N, herein incorporated by reference.

76. Any act(s) performed by one or more entities other than Salesforce and involved in the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a), is/are attributable to Salesforce. Salesforce has acted and continues to act as an agent on behalf of such entities. Salesforce has formed a joint enterprise with one or more such entities, and together, Salesforce and such entity/entities make, use, offer to sell, and/or sell the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have entered into an agreement(s), express or implied, related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a common purpose related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a community of pecuniary interest related to the making, using, offer for sale, and/or sale of the

Accused Products in violation of 35 U.S.C. § 271(a).[16, 17, 18] And Salesforce and such entity/entities each have had an equal voice in the direction of the enterprise related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Unless enjoined by this Court and ordered to discontinue such infringing activities, Salesforce will continue to infringe Outleads's patent rights under the Asserted Patents in violation of 35 U.S.C. § 271(a).

77. Salesforce has indirectly infringed and continues to indirectly infringe at least claim 1 of the '061 Patent under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, and with knowledge in accordance with the allegations of ¶¶ 29-37, knowingly and intentionally inducing others to directly infringe the '061 Patent. On information and belief, past users of the Accused Products directly infringed at least claim 1 of the '061 Patent when they used the Accused Products for such products' ordinary, customary, and intended use, and, in particular, used Salesforce's Web-to-Lead and Web-to-Case services in the directly infringing manner described in Exhibit N hereto. On information and belief, Salesforce's affirmative acts of inducement included, without limitation and with specific intent to encourage the infringement, having knowingly induced customers to use the Accused Products within the United States in the ordinary, customary, and intended way, and in particular, in the directly infringing manner described in Exhibit N hereto, by, directly or through intermediaries, having supplied such Accused Products to customers within the United States and having instructed and encouraged such

---

[16] https://www.salesforce.com/news/press-releases/2017/11/06/salesforce-and-google-form-new-strategic-partnership/#:~:text=SAN%20FRANCISCO%E2%80%93DREAMFORCE%202017%E2%80%94November,more%20collaborative%20experiences%20for%20customers.

[17] https://www.salesforce.com/news/press-releases/2023/09/12/salesforce-google-workspace-ai-partnership/

[18] https://www.salesforce.com/news/press-releases/2025/02/24/google-partnership-expansion-gemini-agentforce/

customers how to use the Accused Products in the ordinary, customary, and intended way, and, in particular, in the directly infringing manner described in Exhibit N hereto, which Salesforce knew or should have known infringed at least claim 1 of the ’061 Patent. Salesforce’s affirmative acts of inducement further included, without limitation and with specific intent to encourage the infringement, any one or a combination of encouraging and/or facilitating third-party infringement through having advertised, marketed, and disseminated the Accused Products and components thereof; and having created, published and/or provided sales, promotional, and marketing materials, supporting materials, product manuals, user guides, and/or technical support and other information relating to the Accused Products and functionality thereof. A specific, non-limiting example of said publications include instructions on generating and testing web-to-case forms provided by Salesforce:

## Generate and Test Your Web-to-Case Form

Generate HTML code that can be inserted into your company's website to capture cases in a web form. Whenever someone submits information using the form, a case is created.

REQUIRED EDITIONS

View supported editions.

| USER PERMISSIONS NEEDED | |
| --- | --- |
| To set up Web-to-Case: | Customize Application |
| To generate Web-to-Case HTML | Customize Application |

1. Complete the steps in Prepare for Web-to-Case and Turn On and Customize Web-to-Case.
2. From Setup, enter `Web-to-Case HTML Generator` in the Quick Find box, then select **Web-to-Case HTML Generator**.
3. Select the fields to include on your Web-to-Case form.
4. If your organization has a self-service portal and you want web-generated cases to be visible to portal users, select **Visible in Self-Service Portal**.
5. Specify the complete URL to which customers are directed after they submit their information. For example, the URL can be for a “thank you” page or your company's home page.
6. If **Require ReCAPTCHA Verification** is selected on the Web-to-Case page in Setup, complete the reCAPTCHA fields. If you select that option after having already generated the HTML code, generate the code again to ensure that it includes the reCAPTCHA validation code.
   a. Leave **Include reCAPTCHA in HTML** selected.
   b. Enter the key pair that you obtained from Google and registered on the Salesforce Platform. Use the [...] pair that is already registered on the Salesforce Platform.
   c. Leave **Enable Server Fallback** selected to prevent the loss of case traffic. If the Google reCAPTCHA [...] offline and spam filtering isn't available, this setting allows all case traffic through.

Ask Agentforce

[19]

78. Salesforce has contributed to the infringement, and continues to contribute to the infringement, either literally and/or under the doctrine of equivalents, of, at least claim 1 of

[19] https://help.salesforce.com/s/articleView?id=service.web_to_case_html.htm&type=5

the ’061 Patent under 35 U.S.C. § 271 by selling, offering to sell, making, and/or using within or into the United States the Accused Products. Salesforce’s contributory infringement included, without limitation, Salesforce’s sale and provision of the Accused Products to customers in the United States for use in practicing at least claim 1 of the ’061 Patent. The Accused Products constitute at least a material part of the invention of the ’061 Patent, are known by Salesforce to be especially made or adapted for use in infringing the ’061 Patent when used for their normal and intended purpose, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

79. Salesforce had actual or constructive knowledge, or was willfully blind to, the existence of Outleads’s patent rights in accordance with the allegations of ¶¶ 29-37; knew or should have known that the advertisement, offer for sale, sale, and/or the facilitation of sales of the Accused Products would induce infringement of at least claim 1 of the ’061 Patent; and/or had a subjective belief that others including end users, infringe the ’061 Patent, but remained willfully blind to the infringement.

80. Despite this knowledge, Salesforce continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious such that it should have been known to Salesforce. Thus, Salesforce’s infringement has been, and continues to be, willful and deliberate.

81. Outleads is entitled to recover damages under 35 U.S.C. § 284 to adequately compensate for Salesforce’s infringement. Salesforce’s ongoing infringement is willful and deliberate, as Salesforce became aware of the infringing nature of the Accused Products at least by virtue of the allegations of ¶¶ 29-37. Despite having actual knowledge of the ’061 Patent, Salesforce has continued its infringing activities.

82. Outleads has been and continues to be damaged and irreparably harmed by Salesforce's infringement of the '061 Patent. This irreparable harm will continue unless this Court enjoins Salesforce.

83. Salesforce's conduct in infringing the '061 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

**COUNT III: INFRINGEMENT OF U.S. PATENT NO. 11,671,397**

84. Outleads repeats and realleges the foregoing paragraphs as if fully set forth herein.

85. On June 6, 2023, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '397 Patent, titled "System for Associating Offline Data with Online Activity."

86. The '397 Patent is valid and enforceable.

87. The '397 Patent is a divisional of the '046 Patent and likewise tackles the long-standing "broken identity" problem in web analytics, further enhancing system performance and privacy. '397 Patent, 3:8-18. The '397 Patent employs an anonymous, server-generated user ID and a unified tracking system that centrally manages the linking of data from all channels, rather than requiring users to log into every channel or exposing sensitive PII to connect a person's identities. *Id.*, 4:4-31. The '397 Patent further describes the "cookie-less" integration of offline data with online user activity. For example, the '397 claims recite that additional information about the user is collected from at least one source other than the visited website "without a use of cookies," and this information is appended to the user's activity record in a translated, parseable format. *Id.*, 51:33-60.

88. The '397 Patent establishes another highly concrete, end-to-end architecture for synchronizing offline interactions with active online web sessions. *Id.*, 4:17-31, 47:45-55, Abstract. Given the disclosed unique sequence of dynamically generating a record ID, intercepting

offline activities, and reconciling that offline event with a visitor's digital user-level identifier, the claims provide a deterministic means for cross-channel data matching. *Id.*, 5:49-54, 6:29-41, 51:33-60. This tightly coupled, focused framework offers a distinct technical advantage that bridges legacy telecom infrastructure with modern web analytics platforms in real-time. *Id.*, 3:9-18, 4:4-16, 5:22-30.

89. The '397 Patent thus claims a tracking system with an unconventional architectural design to securely capture and bind fragmented user footprints (including stateless browser sessions and offline interactions) into a single story of that user's journey. *Id.*, 3:29-44, 4:4-31. The system operates without divulging personal data or relying on browser cookies for continuity like prior art attempts to create a unified system, thereby creating a privacy-preserving yet highly effective way to enhance tracking data in real time. *Id.*, 3:9-18, 51:33-60.

90. The '397 Patent also improves the speed and efficiency of data integration and enrichment. *Id.*, 3:29-44. By dynamically exchanging information through application-level interfaces (APIs), the tracking server eliminates the latency and low match rates of periodic batch uploads. *Id.*, 12:20-38, 12:62-13:4, 2:49-67. For example, if a user who filled out a web form later makes a phone call, the system automatically updates the user's record such that the online analytics or advertising platforms have instant access. *Id.*, 3:65-4:16. This real-time, deterministic processing optimizes the performance of remote analytics servers and ensures that web analytics decisions (like ad targeting or personalization) always reflect the most up-to-date, comprehensive view of each user's engagement, including both online and offline data if available. *Id.*, 4:4-16. In short, the '397 Patent's architecture offers network efficiency gains and prevents the wasted effort of serving ads to, e.g., already "converted" customers.

91. The ’397 Patent also includes dependent claims that further describe the claimed tracking architecture. For example, dependent claim 18 recites that the tracking system dynamically groups disparate user activity records—corresponding to different user-level identifiers—into unified files based on additional offline source data, resolving fragmentation that would otherwise persist across separate identifiers. This configuration establishes a specific structural feedback loop between the tracking server and recipient analytics systems where grouped records are generated, transmitted, and reused to govern subsequent analytics and targeting operations, reflecting an architectural improvement over existing system’s generic data correlation. *Id.*, 3:9-44.

92. Outleads holds all rights, title, and interest in and to the ’397 Patent, including the right to bring this suit and recover all past, present, and future damages for infringement of the ’397 Patent. Salesforce is not licensed to the ’397 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the ’397 Patent whatsoever. As such, Salesforce’s infringement described below has injured, and continues to injure, Plaintiff.

93. Salesforce, in violation of 35 U.S.C. § 271, has directly infringed and continues to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the ’397 Patent by making, using, offering to sell, and/or selling in the United States without authority, products, equipment, software, and/or services, including without limitation, the Accused Products, including Salesforce’s Web-to-Lead and Web-to-Case services, that practice at least claim 1 of the ’397 Patent. Salesforce’s infringement of the ’397 Patent arises from its own actions. Salesforce’s infringement also arises from its actions alone, or jointly with one or more partners (or third parties), as an agent, pursuant to a joint enterprise, or an equivalent arrangement.

A claim chart setting forth certain nonlimiting examples of Salesforce's infringement accompanies this Complaint as Exhibit O, herein incorporated by reference.

94. Any act(s) performed by one or more entities other than Salesforce and involved in the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a), is/are attributable to Salesforce. Salesforce has acted and continues to act as an agent on behalf of such entities. Salesforce has formed a joint enterprise with one or more such entities, and together, Salesforce and such entity/entities make, use, offer to sell, and/or sell the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have entered into an agreement(s), express or implied, related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a common purpose related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a community of pecuniary interest related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a).[20, 21, 22] And Salesforce and such entity/entities each have had an equal voice in the direction of the enterprise related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Unless enjoined by this Court and ordered to discontinue such infringing activities, Salesforce will continue to infringe Outleads's patent rights under the Asserted Patents in violation of 35 U.S.C. § 271(a).

---

[20] https://www.salesforce.com/news/press-releases/2017/11/06/salesforce-and-google-form-new-strategic-partnership/#:~:text=SAN%20FRANCISCO%E2%80%93DREAMFORCE%202017%E2%80%94November,more%20collaborative%20experiences%20for%20customers.

[21] https://www.salesforce.com/news/press-releases/2023/09/12/salesforce-google-workspace-ai-partnership/

[22] https://www.salesforce.com/news/press-releases/2025/02/24/google-partnership-expansion-gemini-agentforce/

95. Salesforce has indirectly infringed and continues to indirectly infringe at least claim 1 of the ’397 Patent under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, and with knowledge in accordance with the allegations of ¶¶ 29-37, knowingly and intentionally inducing others to directly infringe the ’397 Patent. On information and belief, past users of the Accused Products directly infringed at least claim 1 of the ’397 Patent when they used the Accused Products for such products’ ordinary, customary, and intended use, and, in particular, used Salesforce’s Web-to-Lead and Web-to-Case services in the directly infringing manner described in Exhibit O hereto. On information and belief, Salesforce’s affirmative acts of inducement included, without limitation and with specific intent to encourage the infringement, having knowingly induced customers to use the Accused Products within the United States in the ordinary, customary, and intended way, and in particular, in the directly infringing manner described in Exhibit O hereto, by, directly or through intermediaries, having supplied such Accused Products to customers within the United States and having instructed and encouraged such customers how to use the Accused Products in the ordinary, customary, and intended way, and, in particular, in the directly infringing manner described in Exhibit O hereto, which Salesforce knew or should have known infringed at least claim 1 of the ’397 Patent. Salesforce’s affirmative acts of inducement further included, without limitation and with specific intent to encourage the infringement, any one or a combination of encouraging and/or facilitating third-party infringement through having advertised, marketed, and disseminated the Accused Products and components thereof; and having created, published and/or provided sales, promotional, and marketing materials; supporting materials; product manuals; user guides; and/or technical support and other information relating to the Accused Products and functionality thereof. A specific, non-limiting

example of said publications include instructions on generating and testing Web-to-Case forms provided by Salesforce:



## Generate and Test Your Web-to-Case Form

Generate HTML code that can be inserted into your company's website to capture cases in a web form. Whenever someone submits information using the form, a case is created.

REQUIRED EDITIONS

View supported editions.

| USER PERMISSIONS NEEDED | |
|---|---|
| To set up Web-to-Case: | Customize Application |
| To generate Web-to-Case HTML | Customize Application |

1. Complete the steps in Prepare for Web-to-Case and Turn On and Customize Web-to-Case.
2. From Setup, enter `Web-to-Case HTML Generator` in the Quick Find box, then select **Web-to-Case HTML Generator**.
3. Select the fields to include on your Web-to-Case form.
4. If your organization has a self-service portal and you want web-generated cases to be visible to portal users, select **Visible in Self-Service Portal**.
5. Specify the complete URL to which customers are directed after they submit their information. For example, the URL can be for a "thank you" page or your company's home page.
6. If **Require ReCAPTCHA Verification** is selected on the Web-to-Case page in Setup, complete the reCAPTCHA fields. If you select that option after having already generated the HTML code, generate the code again to ensure that it includes the reCAPTCHA validation code.
   a. Leave **Include reCAPTCHA in HTML** selected.
   b. Enter the key pair that you obtained from Google and registered on the Salesforce Platform. Use the pair that is already registered on the Salesforce Platform.
   c. Leave **Enable Server Fallback** selected to prevent the loss of case traffic. If the Google reCAPTCHA s offline and spam filtering isn't available, this setting allows all case traffic through.

Ask Agentforce

[23]

96. Salesforce has contributed to the infringement, and continues to contribute to the infringement, either literally and/or under the doctrine of equivalents, of, at least claim 1 of the ’397 Patent under 35 U.S.C. § 271 by selling, offering to sell, making, and/or using within or into the United States the Accused Products. Salesforce’s contributory infringement included, without limitation, Salesforce’s sale and provision of the Accused Products to customers in the United States for use in practicing at least claim 1 of the ’397 Patent. The Accused Products constitute at least a material part of the invention of the ’397 Patent, are known by Salesforce to be especially made or adapted for use in infringing the ’397 Patent when used for their normal and intended purpose, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

[23] https://help.salesforce.com/s/articleView?id=service.web_to_case_html.htm&type=5

97. Salesforce had actual or constructive knowledge, or was willfully blind to, the existence of Outleads's patent rights in accordance with the allegations of ¶¶ 29-37; knew or should have known that the advertisement, offer for sale, sale, and/or the facilitation of sales of the Accused Products would induce infringement of at least claim 1 of the '397 Patent; and/or had a subjective belief that others including end users, infringe the '397 Patent, but remained willfully blind to the infringement.

98. Despite this knowledge, Salesforce continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Salesforce. Thus, Salesforce's infringement has been, and continues to be, willful and deliberate.

99. Outleads is entitled to recover damages under 35 U.S.C. § 284 to adequately compensate for Salesforce's infringement. Salesforce's ongoing infringement is willful and deliberate, as Salesforce became aware of the infringing nature of the Accused Products at least by virtue of the allegations of ¶¶ 29-37. Despite having actual knowledge of the '397 Patent, Salesforce has continued its infringing activities.

100. Outleads has been and continues to be damaged and irreparably harmed by Salesforce's infringement of the '397 Patent. This irreparable harm will continue unless this Court enjoins Salesforce.

101. Salesforce's conduct in infringing the '397 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 10,798,046

102. Outleads repeats and realleges the foregoing paragraphs as if fully set forth herein.

103. On October 6, 2020, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '046 Patent, titled "System for Integrating Offsite Data Records with Online Data Records."

104. The '046 Patent is valid and enforceable.

105. The '046 Patent—parent of the '397 Patent—similarly establishes a highly distributed, multi-node network architecture engineered to synchronize asynchronous interactions across physically and logically distinct computer systems. '046 Patent, 2:12-23. The '046 Patent describes a multi-system topology composed of a first computer system (for identity tracking), a second computer system (for lead management), and an external computer system (for website hosting) to manage the association of identifiers across different entities. *Id.*, 3:48-4:33. The claimed architecture utilizes the first computer system to store a database of website access records identified by a unique identifier while the second computer system maintains records containing user-related information obtained from specific events. *Id.*, 4:47-5:12. The '046 patent thus allows the first computer system to use the identifier to associate the distributed data sets, effectively linking information residing on logically distinct nodes to track user activity independent of the website host. *Id.*, 2:48-62.

106. The '046 Patent's disclosed and claimed network architecture provides technical advantages by enabling disparate databases, front-end web servers, third-party event processors, etc. to enrich a user's CRM data or profile without requiring the fragile, tightly coupled software integrations of prior systems. *Id.*, 2:12-23; 3:23-32, 3:39-54. The '046 Patent describes and claims a network architecture for natively solving the technical challenges associated with cross-channel data silos with unifying structure to provide a highly cohesive digital footprint, such as an enriched CRM record. *Id.*, 2:12-23, 3:48-61, 4:34-46, 12:1-24, 12:52-63.

107. By claiming an improved network arrangement and operational sequence, where a shared identifier is passed among separate environments—one to track initial web access, another to process a user event, and an independent node to append additional information from distinct sources—the claims provide a novel and advanced network architecture for cross-channel CRM data reconciliation.

108. The ’046 Patent also includes dependent claims that further improve computer functionality within the claimed architecture. For example, dependent claim 14 recites the first computer system including an instruction set configured to collect and display information from the associated record stored on the second computer system in conjunction with its own locally stored data. This coordinated retrieval and presentation of distributed data improved software dashboard interoperability and data aggregation, extending the capabilities of existing online advertising and analytics systems beyond their prior, siloed operation. *Id.*, 2:48-3:43.

109. Outleads holds all rights, title, and interest in and to the ’046 Patent, including the right to bring this suit and recover all past, present, and future damages for infringement of the ’046 Patent. Salesforce is not licensed to the ’046 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the ’046 Patent whatsoever. As such, Salesforce’s infringement described below has injured, and continues to injure, Plaintiff.

110. Salesforce, in violation of 35 U.S.C. § 271, has directly infringed and continues to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the ’046 Patent by making, using, offering to sell, and/or selling in the United States without authority, products, equipment, software, and/or services, including without limitation, the Accused Products, including Salesforce’s Web-to-Lead and Web-to-Case services, that practice claim 1 of the ’046 Patent. Salesforce’s infringement of the ’046 Patent arises from its own actions.

Salesforce's infringement also arises from its actions alone, or jointly with one or more partners (or third parties), as an agent, pursuant to a joint enterprise, or an equivalent arrangement. A claim chart setting forth certain nonlimiting examples of Salesforce's infringement accompanies this Complaint as Exhibit P, herein incorporated by reference.

111. Any act(s) performed by one or more entities other than Salesforce and involved in the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a), is/are attributable to Salesforce. Salesforce has acted and continues to act as an agent on behalf of such entities. Salesforce has formed a joint enterprise with one or more such entities, and together, Salesforce and such entity/entities make, use, offer to sell, and/or sell the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have entered into an agreement(s), express or implied, related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a common purpose related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a community of pecuniary interest related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a).[24, 25, 26] And Salesforce and such entity/entities each have had an equal voice in the direction of the enterprise related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Unless enjoined

[24] https://www.salesforce.com/news/press-releases/2017/11/06/salesforce-and-google-form-new-strategic-partnership/#:~:text=SAN%20FRANCISCO%E2%80%93DREAMFORCE%202017%E2%80%94November,more%20collaborative%20experiences%20for%20customers.
[25] https://www.salesforce.com/news/press-releases/2023/09/12/salesforce-google-workspace-ai-partnership/
[26] https://www.salesforce.com/news/press-releases/2025/02/24/google-partnership-expansion-gemini-agentforce/

by this Court and ordered to discontinue such infringing activities, Salesforce will continue to infringe Outleads's patent rights under the Asserted Patents in violation of 35 U.S.C. § 271(a).

112. Salesforce has indirectly infringed and continues to indirectly infringe at least claim 1 of the '046 Patent under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, and with knowledge in accordance with the allegations of ¶¶ 29-37, knowingly and intentionally inducing others to directly infringe the '046 Patent. On information and belief, past users of the Accused Products directly infringed at least claim 1 of the '046 patent when they used the Accused Products for such products' ordinary, customary, and intended use, and, in particular, used Salesforce's Web-to-Lead and Web-to-Case services in the directly infringing manner described in Exhibit P hereto. On information and belief, Salesforce's affirmative acts of inducement included, without limitation and with specific intent to encourage the infringement, having knowingly induced customers to use the Accused Products within the United States in the ordinary, customary, and intended way, and in particular, in the directly infringing manner described in Exhibit P hereto, by, directly or through intermediaries, having supplied such Accused Products to customers within the United States and having instructed and encouraged such customers how to use the Accused Products in the ordinary, customary, and intended way, and, in particular, in the directly infringing manner described in Exhibit P hereto, which Salesforce knew or should have known infringed at least claim 1 of the '046 Patent. Salesforce's affirmative acts of inducement further included, without limitation and with specific intent to encourage the infringement, any one or a combination of encouraging and/or facilitating third-party infringement through having advertised, marketed, and disseminated the Accused Products and components thereof; and having created, published and/or provided sales, promotional, and marketing materials, supporting materials, product manuals, user guides, and/or technical support and other

information relating to the Accused Products and functionality thereof. A specific, non-limiting example of said publications include instructions on generating and testing Web-to-Case forms provided by Salesforce:



## Generate and Test Your Web-to-Case Form

Generate HTML code that can be inserted into your company's website to capture cases in a web form. Whenever someone submits information using the form, a case is created.

REQUIRED EDITIONS

View supported editions.

| USER PERMISSIONS NEEDED | |
|---|---|
| To set up Web-to-Case: | Customize Application |
| To generate Web-to-Case HTML | Customize Application |

1. Complete the steps in Prepare for Web-to-Case and Turn On and Customize Web-to-Case.
2. From Setup, enter `Web-to-Case HTML Generator` in the Quick Find box, then select **Web-to-Case HTML Generator**.
3. Select the fields to include on your Web-to-Case form.
4. If your organization has a self-service portal and you want web-generated cases to be visible to portal users, select **Visible in Self-Service Portal**.
5. Specify the complete URL to which customers are directed after they submit their information. For example, the URL can be for a "thank you" page or your company's home page.
6. If **Require ReCAPTCHA Verification** is selected on the Web-to-Case page in Setup, complete the reCAPTCHA fields. If you select that option after having already generated the HTML code, generate the code again to ensure that it includes the reCAPTCHA validation code.
   a. Leave **Include reCAPTCHA in HTML** selected.
   b. Enter the key pair that you obtained from Google and registered on the Salesforce Platform. Use the ... pair that is already registered on the Salesforce Platform.
   c. Leave **Enable Server Fallback** selected to prevent the loss of case traffic. If the Google reCAPTCHA ... offline and spam filtering isn't available, this setting allows all case traffic through.



[27]

113. Salesforce has contributed to the infringement, and continues to contribute to the infringement, either literally and/or under the doctrine of equivalents, of, at least claim 1 of the '046 Patent under 35 U.S.C. § 271 by selling, offering to sell, making, and/or using within or into the United States the Accused Products. Salesforce's contributory infringement included, without limitation, Saleforce's sale and provision of the Accused Products to customers in the United States for use in practicing at least claim 1 of the '046 Patent. The Accused Products constitute at least a material part of the invention of the '046 Patent, are known by Salesforce to be especially made or adapted for use in infringing the '046 Patent when used for their normal and intended purpose, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

---

[27] https://help.salesforce.com/s/articleView?id=service.web_to_case_html.htm&type=5

114. Salesforce had actual or constructive knowledge, or was willfully blind to, the existence of Outleads's patent rights in accordance with the allegations of ¶¶ 29-37; knew or should have known that the advertisement, offer for sale, sale, and/or the facilitation of sales of the Accused Products would induce infringement of at least claim 1 of the '046 Patent; and/or had a subjective belief that others including end users, infringe the '046 Patent, but remained willfully blind to the infringement.

115. Despite this knowledge, Salesforce continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Salesforce. Thus, Salesforce's infringement has been, and continues to be, willful and deliberate.

116. Outleads is entitled to recover damages under 35 U.S.C. § 284 to adequately compensate for Salesforce's infringement. Salesforce's ongoing infringement is willful and deliberate, as Salesforce became aware of the infringing nature of the Accused Products at least by virtue of the allegations of ¶¶ 29-37. Despite having actual knowledge of the '046 Patent, Salesforce has continued its infringing activities.

117. Outleads has been and continues to be damaged and irreparably harmed by Salesforce's infringement of the '046 Patent. This irreparable harm will continue unless this Court enjoins Salesforce.

118. Salesforce's conduct in infringing the '046 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

**COUNT V: INFRINGEMENT OF U.S. PATENT NO. 10,523,627**

119. Outleads repeats and realleges the foregoing paragraphs as if fully set forth herein.

120. On December 31, 2019, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '627 Patent, titled "Integrating Offsite Data Records with Online Data Records."

121. The '627 Patent is valid and enforceable.

122. The '627 Patent provides a network system for tracking and integrating user data generated through online "native form" submissions. '627 Patent, Claim 1. Allowed without any prior art rejections, the '627 Patent claims an example of Outleads's highly distributed, multi-node network architecture engineered to synchronize asynchronous interactions across physically and logically distinct computer systems. *Id.*, 3:57-4:18. When a user completes a native form on a host website, a unique tracking identifier is generated and passed alongside the form data to a second, logically distinct computer system, such as a CRM database. *Id.*, 51:20-52:3. As agents subsequently input offline, ancillary data into the CRM—such as a closed sale or follow-up notes, etc.—the '627 Patent's claimed architecture utilizes the retained identifier to route and integrate the asynchronous, offline events back to the user's original online analytics profile. *Id.*, 3:41-57, 3:58-4:3, 6:37-52. The result is a novel architecture providing uniquely enriched CRM data.

123. The '627 Patent structurally describes a multi-node network system of four cooperating computing entities. The claimed architecture includes an "external computer system" that hosts the target website and serves a native form to a "plurality of user computers" operated by end-users. *Id.*, 51:21-52:3. A "first computer system" also acts as the central tracking node, issuing a unique identifier tied to the user's web session, and a "second computer system" (such as a CRM database) acts as the downstream repository that ingests both the completed form data and the tracking identifier. *Id.* With the "second computer system" storing the user's "form submitted information" and the "identifier," the '627 Patent's structural arrangement allows

"ancillary information, collected from sources other than a website hosting the native form," to be subsequently "appended to the record." *Id.*, 52:5-10. Because this shared identifier persists across the network, the "first computer system" becomes capable of retrieving these otherwise delayed, real-world updates from a downstream database using the shared identifier to tie the offline activities directly back to the user's original online web history. *Id.*, 49:6-43, 50:3-26.

124. The '627 Patent also includes dependent claims that further describe how identifiers are structurally integrated into system communications. For example, dependent claims 7 and 18 require a specific mechanism for appending identifiers to data strings as a prefix, intermediary segment, or suffix, ensuring that the identifiers survive technical transmission across multiple entities in a translated, parseable format that recipient systems can recognize and process. By defining the precise structure and placement of identifiers within transmitted data, the claims recite a protocol-level solution that enables reliable cross-system data continuity rather than a generic concept of data association. *Id.*, 2:26-43, 3:16-31, 3:36-4:3.

125. Outleads holds all rights, title, and interest in and to the '627 Patent, including the right to bring this suit and recover all past, present, and future damages for infringement of the '627 Patent. Salesforce is not licensed to the '627 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '627 Patent whatsoever. As such, Salesforce's infringement described below has injured, and continues to injure, Plaintiff.

126. Salesforce, in violation of 35 U.S.C. § 271, has directly infringed and continues to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '627 Patent by making, using, offering to sell, and/or selling in the United States without authority, products, equipment, software, and/or services, including without limitation, the Accused Products, including Salesforce's Web-to-Lead and Web-to-Case services, that practice

claim 1 of the ’627 Patent. Salesforce’s infringement of the ’627 Patent arises from its own actions. Salesforce’s infringement also arises from its actions alone, or jointly with one or more partners (or third parties), as an agent, pursuant to a joint enterprise, or an equivalent arrangement. A claim chart setting forth certain nonlimiting examples of Salesforce’s infringement accompanies this Complaint as Exhibit Q, herein incorporated by reference.

127. Any act(s) performed by one or more entities other than Salesforce and involved in the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a), is/are attributable to Salesforce. Salesforce has acted and continues to act as an agent on behalf of such entities. Salesforce has formed a joint enterprise with one or more such entities, and together, Salesforce and such entity/entities make, use, offer to sell, and/or sell the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have entered into an agreement(s), express or implied, related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a common purpose related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a community of pecuniary interest related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a).[28, 29, 30] And Salesforce and such entity/entities each have had an equal voice in the direction of the enterprise related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Unless enjoined

[28] https://www.salesforce.com/news/press-releases/2017/11/06/salesforce-and-google-form-new-strategic-partnership/#:~:text=SAN%20FRANCISCO%E2%80%93DREAMFORCE%202017%E2%80%94November,more%20collaborative%20experiences%20for%20customers.
[29] https://www.salesforce.com/news/press-releases/2023/09/12/salesforce-google-workspace-ai-partnership/
[30] https://www.salesforce.com/news/press-releases/2025/02/24/google-partnership-expansion-gemini-agentforce/

by this Court and ordered to discontinue such infringing activities, Salesforce will continue to infringe Outleads's patent rights under the Asserted Patents in violation of 35 U.S.C. § 271(a).

128. Salesforce has indirectly infringed and continues to indirectly infringe at least claim 1 of the '627 Patent under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, and with knowledge in accordance with the allegations of ¶¶ 29-37, knowingly and intentionally inducing others to directly infringe the '627 Patent. On information and belief, past users of the Accused Products directly infringed at least claim 1 of the '627 Patent when they used the Accused Products for such products' ordinary, customary, and intended use, and, in particular, used Salesforce's Web-to-Lead and Web-to-Case services in the directly infringing manner described in Exhibit Q hereto. On information and belief, Salesforce's affirmative acts of inducement included, without limitation and with specific intent to encourage the infringement, having knowingly induced customers to use the Accused Products within the United States in the ordinary, customary, and intended way, and in particular, in the directly infringing manner described in Exhibit Q hereto, by, directly or through intermediaries, having supplied such Accused Products to customers within the United States and having instructed and encouraged such customers how to use the Accused Products in the ordinary, customary, and intended way, and, in particular, in the directly infringing manner described in Exhibit Q hereto, which Salesforce knew or should have known infringed at least claim 1 of the '627 Patent. Salesforce's affirmative acts of inducement further included, without limitation and with specific intent to encourage the infringement, any one or a combination of encouraging and/or facilitating third-party infringement through having advertised, marketed, and disseminated the Accused Products and components thereof; and having created, published and/or provided sales, promotional, and marketing materials; supporting materials; product manuals; user guides; and/or technical support and other

information relating to the Accused Products and functionality thereof. A specific, non-limiting example of said publications include instructions on generating and testing web-to-case forms provided by Salesforce:

## Generate and Test Your Web-to-Case Form

Generate HTML code that can be inserted into your company's website to capture cases in a web form. Whenever someone submits information using the form, a case is created.

REQUIRED EDITIONS

View supported editions.

| USER PERMISSIONS NEEDED | |
|---|---|
| To set up Web-to-Case: | Customize Application |
| To generate Web-to-Case HTML | Customize Application |

1. Complete the steps in Prepare for Web-to-Case and Turn On and Customize Web-to-Case.
2. From Setup, enter `Web-to-Case HTML Generator` in the Quick Find box, then select **Web-to-Case HTML Generator**.
3. Select the fields to include on your Web-to-Case form.
4. If your organization has a self-service portal and you want web-generated cases to be visible to portal users, select **Visible in Self-Service Portal**.
5. Specify the complete URL to which customers are directed after they submit their information. For example, the URL can be for a "thank you" page or your company's home page.
6. If **Require ReCAPTCHA Verification** is selected on the Web-to-Case page in Setup, complete the reCAPTCHA fields. If you select that option after having already generated the HTML code, generate the code again to ensure that it includes the reCAPTCHA validation code.
   a. Leave **Include reCAPTCHA in HTML** selected.
   b. Enter the key pair that you obtained from Google and registered on the Salesforce Platform. Use the pair that is already registered on the Salesforce Platform.
   c. Leave **Enable Server Fallback** selected to prevent the loss of case traffic. If the Google reCAPTCHA offline and spam filtering isn't available, this setting allows all case traffic through.

Ask Agentforce

[31]

129. Salesforce has contributed to the infringement, and continues to contribute to the infringement, either literally and/or under the doctrine of equivalents, of, at least claim 1 of the ’627 Patent under 35 U.S.C. § 271 by selling, offering to sell, making, and/or using within or into the United States the Accused Products. Salesforce’s contributory infringement included, without limitation, Salesforce’s sale and provision of the Accused Products to customers in the United States for use in practicing at least claim 1 of the ’627 Patent. The Accused Products constitute at least a material part of the invention of the ’627 Patent, are known by Salesforce to be especially made or adapted for use in infringing the ’627 Patent when used for their normal and intended purpose, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

[31] https://help.salesforce.com/s/articleView?id=service.web_to_case_html.htm&type=5

130. Salesforce had actual or constructive knowledge, or was willfully blind to, the existence of Outleads's patent rights in accordance with the allegations of ¶¶ 29-37; knew or should have known that the advertisement, offer for sale, sale, and/or the facilitation of sales of the Accused Products would induce infringement of at least claim 1 of the '627 Patent; and/or had a subjective belief that others including end users, infringe the '627 Patent, but remained willfully blind to the infringement.

131. Despite this knowledge, Salesforce continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Salesforce. Thus, Salesforce's infringement has been, and continues to be, willful and deliberate.

132. Outleads is entitled to recover damages under 35 U.S.C. § 284 to adequately compensate for Salesforce's infringement. Salesforce's ongoing infringement is willful and deliberate, as Salesforce became aware of the infringing nature of the Accused Products at least by virtue of the allegations of ¶¶ 29-37. Despite having actual knowledge of the '627 Patent, Salesforce has continued its infringing activities.

133. Outleads has been and continues to be damaged and irreparably harmed by Salesforce's infringement of the '627 Patent. This irreparable harm will continue unless this Court enjoins Salesforce.

134. Salesforce's conduct in infringing the '627 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

**COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 9,491,249**

135. Outleads repeats and realleges the foregoing paragraphs as if fully set forth herein.

136. On November 8, 2016, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '249 Patent, titled "Integrating Offsite Activities Related to Chat and Text Messaging with Online Data Records."

137. The '249 Patent is valid and enforceable.

138. The '249 Patent discloses novel methods for integrating offline, offsite, and online data records by establishing a highly distributed, multi-node network architecture for synchronizing traditionally asynchronous activities in existing systems. The '249 Patent claims methods for enforcing a network infrastructure that appends a system-generated identifier—whether a user level identifier, tracking identifier, or a temporary-to-permanent identifier—into a text or chat message initiation link. '249 Patent, Abstract, 1:35-48, 24:55-25:25. This mechanically embedded identity tether persists as the communication moves offsite, deterministically routing asynchronous offline data back to trigger the creation of a brand-new, unified data record. *Id.*, 3:8-36, 3:63-4:5.

139. The claims structurally execute this synchronization across at least four—and in some claims five computer systems. *Id.*, 24:55-25:25, 26:62-27:42, 29:31-30:19. A first computer system acts as the centralized data management node by generating the initial user identifier, while a user-facing second computer system presents the web page and handles the actual transmission of the appended text or chat message. *Id.*, 24:55-25:25. The architecture further involves a third computer system to capture that transmission and instantiate the newly isolated data record, functioning separately from a fourth agent-operated computer system for appending external offline information. *Id.*, 24:55-25:25. Independent claims 8 and 16 further introduce a fifth computer system for generating tracking identifiers or managing temporary-to-permanent identifier translations. *Id.*, 26:62-27:42, 29:31-30:19.

140. The ’249 Patent also includes dependent claims further describing mechanisms for generating richer tracking data sets for targeted online experiences. For example, dependent claims 5 and 18 use the user level identifier to communicate entered data associated with the record between computers. *Id.*, 26:25-37, 30:34-51. This connection between different types of data, such as offline, offsite, and online data, provides an improvement over techniques for associating offline and online data of existing systems. *Id.*, 2:6-3:3, 3:8-36.

141. Outleads holds all rights, title, and interest in and to the ’249 Patent, including the right to bring this suit and recover all past, present, and future damages for infringement of the ’249 Patent. Salesforce is not licensed to the ’249 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the ’249 Patent whatsoever. As such, Salesforce’s infringement described below has injured, and continues to injure, Plaintiff.

142. Salesforce, in violation of 35 U.S.C. § 271, have directly infringed and continue to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the ’249 Patent by making, using, offering to sell, and/or selling in the United States without authority, products, equipment, software, and/or services, including without limitation, the Accused Products, including Salesforce’s Web-to-Lead and Web-to-Case services, that practice claim 1 of the ’249 Patent. Salesforce’s infringement of the ’249 Patent arises from its own actions. Salesforce’s infringement also arises from its actions alone, or jointly with one or more partners (or third parties), as an agent, pursuant to a joint enterprise, or an equivalent arrangement. A claim chart setting forth certain nonlimiting examples of Salesforce’s infringement accompanies this Complaint as Exhibit R, herein incorporated by reference.

143. Any act(s) performed by one or more entities other than Salesforce and involved in the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C.

§ 271(a), is/are attributable to Salesforce. Salesforce has acted and continues to act as an agent on behalf of such entities. Salesforce has formed a joint enterprise with one or more such entities, and together, Salesforce and such entity/entities make, use, offer to sell, and/or sell the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have entered into an agreement(s), express or implied, related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a common purpose related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a community of pecuniary interest related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a).[32, 33, 34] And Salesforce and such entity/entities each have had an equal voice in the direction of the enterprise related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Unless enjoined by this Court and ordered to discontinue such infringing activities, Salesforce will continue to infringe Outleads's patent rights under the Asserted Patents in violation of 35 U.S.C. § 271(a).

144. Salesforce has indirectly infringed and continues to indirectly infringe at least claim 1 of the '249 Patent under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, and with knowledge in accordance with the allegations of ¶¶ 29-37, knowingly and intentionally inducing others to directly infringe the '249 Patent. On information and belief, past users of the Accused Products directly infringed at least claim 1 of the '249 Patent when they used

---

[32] https://www.salesforce.com/news/press-releases/2017/11/06/salesforce-and-google-form-new-strategic-partnership/#:~:text=SAN%20FRANCISCO%E2%80%93DREAMFORCE%202017%E2%80%94November,more%20collaborative%20experiences%20for%20customers.

[33] https://www.salesforce.com/news/press-releases/2023/09/12/salesforce-google-workspace-ai-partnership/

[34] https://www.salesforce.com/news/press-releases/2025/02/24/google-partnership-expansion-gemini-agentforce/

the Accused Products for such products' ordinary, customary, and intended use, and, in particular, used Salesforce's Web-to-Lead and Web-to-Case services in the directly infringing manner described in Exhibit R hereto. On information and belief, Salesforce's affirmative acts of inducement included, without limitation and with specific intent to encourage the infringement, having knowingly induced customers to use the Accused Products within the United States in the ordinary, customary, and intended way, and in particular, in the directly infringing manner described in Exhibit R hereto, by, directly or through intermediaries, having supplied such Accused Products to customers within the United States and having instructed and encouraged such customers how to use the Accused Products in the ordinary, customary, and intended way, and, in particular, in the directly infringing manner described in Exhibit R hereto, which Salesforce knew or should have known infringed at least claim 1 of the '249 Patent. Salesforce's affirmative acts of inducement further included, without limitation and with specific intent to encourage the infringement, any one or a combination of encouraging and/or facilitating third-party infringement through having advertised, marketed, and disseminated the Accused Products and components thereof; and having created, published and/or provided sales, promotional, and marketing materials; supporting materials; product manuals; user guides; and/or technical support and other information relating to the Accused Products and functionality thereof. A specific, non-limiting example of said publications include instructions on generating and testing web-to-case forms provided by Salesforce:

## Generate and Test Your Web-to-Case Form

Generate HTML code that can be inserted into your company's website to capture cases in a web form. Whenever someone submits information using the form, a case is created.

REQUIRED EDITIONS

View supported editions.

| USER PERMISSIONS NEEDED | |
|---|---|
| To set up Web-to-Case: | Customize Application |
| To generate Web-to-Case HTML | Customize Application |

1. Complete the steps in Prepare for Web-to-Case and Turn On and Customize Web-to-Case.
2. From Setup, enter `Web-to-Case HTML Generator` in the Quick Find box, then select **Web-to-Case HTML Generator**.
3. Select the fields to include on your Web-to-Case form.
4. If your organization has a self-service portal and you want web-generated cases to be visible to portal users, select **Visible in Self-Service Portal**.
5. Specify the complete URL to which customers are directed after they submit their information. For example, the URL can be for a “thank you” page or your company's home page.
6. If **Require ReCAPTCHA Verification** is selected on the Web-to-Case page in Setup, complete the reCAPTCHA fields. If you select that option after having already generated the HTML code, generate the code again to ensure that it includes the reCAPTCHA validation code.
   a. Leave **Include reCAPTCHA in HTML** selected.
   b. Enter the key pair that you obtained from Google and registered on the Salesforce Platform. Use the pair that is already registered on the Salesforce Platform.
   c. Leave **Enable Server Fallback** selected to prevent the loss of case traffic. If the Google reCAPTCHA offline and spam filtering isn't available, this setting allows all case traffic through.

Ask Agentforce

[35]

145. Salesforce has contributed to the infringement, and continues to contribute to the infringement, either literally and/or under the doctrine of equivalents, of, at least claim 1 of the ’249 Patent under 35 U.S.C. § 271 by selling, offering to sell, making, and/or using within or into the United States the Accused Products. Salesforce’s contributory infringement included, without limitation, Salesforce’s sale and provision of the Accused Products to customers in the United States for use in practicing at least claim 1 of the ’249 Patent. The Accused Products constitute at least a material part of the invention of the ’249 Patent, are known by Salesforce to be especially made or adapted for use in infringing the ’249 Patent when used for their normal and intended purpose, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

146. Salesforce had actual or constructive knowledge, or was willfully blind to, the existence of Outleads’s patent rights in accordance with the allegations of ¶¶ 29-37; knew or should have known that the advertisement, offer for sale, sale, and/or the facilitation of sales of the

[35] https://help.salesforce.com/s/articleView?id=service.web_to_case_html.htm&type=5

Accused Products would induce infringement of at least claim 1 of the ’249 Patent; and/or had a subjective belief that others including end users, infringe the ’249 Patent, but remained willfully blind to the infringement.

147. Despite this knowledge, Salesforce continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Salesforce. Thus, Salesforce’s infringement has been, and continues to be, willful and deliberate.

148. Outleads is entitled to recover damages under 35 U.S.C. § 284 to adequately compensate for Salesforce’s infringement. Salesforce’s ongoing infringement is willful and deliberate, as Salesforce became aware of the infringing nature of the Accused Products at least by virtue of the allegations of ¶¶ 29-37. Despite having actual knowledge of the ’249 Patent, Salesforce has continued its infringing activities.

149. Outleads has been and continues to be damaged and irreparably harmed by Salesforce’s infringement of the ’249 Patent. This irreparable harm will continue unless this Court enjoins Salesforce.

150. Salesforce’s conduct in infringing the ’249 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

**COUNT VII: INFRINGEMENT OF U.S. PATENT NO. 9,342,843**

151. Outleads repeats and realleges the foregoing paragraphs as if fully set forth herein.

152. On May 17, 2016, the United States Patent and Trademark Office (“USPTO”) duly and legally issued the ’843 Patent, titled “Integration of Offline Activity Records and Online Data Records.”

153. The ’843 Patent is valid and enforceable.

154. The ’843 Patent introduced a highly distributed, multi-node network architecture for synchronizing otherwise asynchronous interactions across physically and logically distinct computer systems. ’843 Patent, 1:26-34, 2:63-3:43. A foundational patent, the ’843 Patent bridges the data divide between web-based user identification and post-interaction conversions associated with digital form submissions. Rather than relying on traditional siloed tracking, the ’843 Patent claims establish network architecture rules enabling an online tracking identifier to be invisibly appended to a submitted digital form and passed through a distinct sequence of disparate databases and human-operated endpoints. *Id.*, 1:26-34, 24:4-24, 28:6-29:22, 49:50-50:10. This unconventional approach network architecture for tracking user activity established a solution to the complex problem of maintaining an unbroken data chain from an initial online web session to subsequent offline events.

155. The ’843 Patent structures the claimed interaction of up to five interacting computer systems, where the first computer system generates a user-level identifier, a second computer system presents the digital form, and a third computer system creates the initial lead record. *Id.*, 49:50-10. The claimed architecture includes a fourth computer system that appends offline conversion data to the record, which is then routed back to the first computer system using the original identifier. *Id.*, 50:4-7. Moreover, select claims introduce a fifth computer system that functions as a specialized intermediary to generate tracking identifiers and manage their association with the primary user-level identifier. *Id.*, 51:41-52:10. By distributing these discrete steps across specialized computing nodes, the claims mandate a precise interoperability protocol that securely passes digital tracking data between analytics servers, user devices, and enterprise databases. *Id.*, 7:66-8:26, 13:12-58.

156. The '843 Patent also includes dependent claims that further describe how the tracking entity extends the capabilities of online systems across heterogeneous platforms. For example, dependent claims 2, 8, and 13 recite cross-platform identity synchronization techniques for marrying independent datasets using user-level identifiers issued by diversely structured, external computer systems. By coordinating identifier issuance and data exchange across siloed systems, these claims provide efficiencies in data transfer and software interoperability that improve how disparate platforms communicate and operate together. *Id.*, 1:55-2:59.

157. Outleads holds all rights, title, and interest in and to the '843 Patent, including the right to bring this suit and recover all past, present, and future damages for infringement of the '843 Patent. Salesforce is not licensed to the '843 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '843 Patent whatsoever. As such, Salesforce's infringement described below has injured, and continues to injure, Plaintiff.

158. Salesforce, in violation of 35 U.S.C. § 271, have directly infringed and continue to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '843 Patent by making, using, offering to sell, and/or selling in the United States without authority, products, equipment, software, and/or services, including without limitation, the Accused Products, including Salesforce's Web-to-Lead and Web-to-Case services, that practice claim 1 of the '843 Patent. Salesforce's infringement of the '843 Patent arises from its own actions. Salesforce's infringement also arises from its actions alone, or jointly with one or more partners (or third parties), as an agent, pursuant to a joint enterprise, or an equivalent arrangement. A claim chart setting forth certain nonlimiting examples of Salesforce's infringement accompanies this Complaint as Exhibit S, herein incorporated by reference.

159. Any act(s) performed by one or more entities other than Salesforce and involved in the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a), is/are attributable to Salesforce. Salesforce has acted and continues to act as an agent on behalf of such entities. Salesforce has formed a joint enterprise with one or more such entities, and together, Salesforce and such entity/entities make, use, offer to sell, and/or sell the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have entered into an agreement(s), express or implied, related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a common purpose related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Salesforce and such entity/entities have formed a community of pecuniary interest related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a).[36, 37, 38] And Salesforce and such entity/entities each have had an equal voice in the direction of the enterprise related to the making, using, offer for sale, and/or sale of the Accused Products in violation of 35 U.S.C. § 271(a). Unless enjoined by this Court and ordered to discontinue such infringing activities, Salesforce will continue to infringe Outleads's patent rights under the Asserted Patents in violation of 35 U.S.C. § 271(a).

160. Salesforce has indirectly infringed and continues to indirectly infringe at least claim 1 of the '843 Patent under 35 U.S.C. § 271, either literally and/or under the doctrine of

[36] https://www.salesforce.com/news/press-releases/2017/11/06/salesforce-and-google-form-new-strategic-partnership/#:~:text=SAN%20FRANCISCO%E2%80%93DREAMFORCE%202017%E2%80%94November,more%20collaborative%20experiences%20for%20customers.
[37] https://www.salesforce.com/news/press-releases/2023/09/12/salesforce-google-workspace-ai-partnership/
[38] https://www.salesforce.com/news/press-releases/2025/02/24/google-partnership-expansion-gemini-agentforce/

equivalents, and with knowledge in accordance with the allegations of ¶¶ 29-37, knowingly and intentionally inducing others to directly infringe the ’843 Patent. On information and belief, past users of the Accused Products directly infringed at least claim 1 of the ’843 Patent when they used the Accused Products for such products’ ordinary, customary, and intended use, and, in particular, used Salesforce’s Web-to-Lead and Web-to-Case services in the directly infringing manner described in Exhibit S hereto. On information and belief, Salesforce’s affirmative acts of inducement included, without limitation and with specific intent to encourage the infringement, having knowingly induced customers to use the Accused Products within the United States in the ordinary, customary, and intended way, and in particular, in the directly infringing manner described in Exhibit S hereto, by, directly or through intermediaries, having supplied such Accused Products to customers within the United States and having instructed and encouraged such customers how to use the Accused Products in the ordinary, customary, and intended way, and, in particular, in the directly infringing manner described in Exhibit S hereto, which Salesforce knew or should have known infringed at least claim 1 of the ’843 Patent. Salesforce’s affirmative acts of inducement further included, without limitation and with specific intent to encourage the infringement, any one or a combination of encouraging and/or facilitating third-party infringement through having advertised, marketed, and disseminated the Accused Products and components thereof; and having created, published and/or provided sales, promotional, and marketing materials; supporting materials; product manuals; user guides; and/or technical support and other information relating to the Accused Products and functionality thereof. A specific, non-limiting example of said publications include instructions on generating and testing web-to-case forms provided by Salesforce:



## Generate and Test Your Web-to-Case Form

Generate HTML code that can be inserted into your company's website to capture cases in a web form. Whenever someone submits information using the form, a case is created.

REQUIRED EDITIONS

View supported editions.

| USER PERMISSIONS NEEDED | |
|---|---|
| To set up Web-to-Case: | Customize Application |
| To generate Web-to-Case HTML | Customize Application |

1. Complete the steps in Prepare for Web-to-Case and Turn On and Customize Web-to-Case.
2. From Setup, enter `Web-to-Case HTML Generator` in the Quick Find box, then select **Web-to-Case HTML Generator**.
3. Select the fields to include on your Web-to-Case form.
4. If your organization has a self-service portal and you want web-generated cases to be visible to portal users, select **Visible in Self-Service Portal**.
5. Specify the complete URL to which customers are directed after they submit their information. For example, the URL can be for a "thank you" page or your company's home page.
6. If **Require ReCAPTCHA Verification** is selected on the Web-to-Case page in Setup, complete the reCAPTCHA fields. If you select that option after having already generated the HTML code, generate the code again to ensure that it includes the reCAPTCHA validation code.
   a. Leave **Include reCAPTCHA in HTML** selected.
   b. Enter the key pair that you obtained from Google and registered on the Salesforce Platform. Use the pair that is already registered on the Salesforce Platform.
   c. Leave **Enable Server Fallback** selected to prevent the loss of case traffic. If the Google reCAPTCHA offline and spam filtering isn't available, this setting allows all case traffic through.



[39]

161. Salesforce has contributed to the infringement, and continues to contribute to the infringement, either literally and/or under the doctrine of equivalents, of, at least claim 1 of the ’843 Patent under 35 U.S.C. § 271 by selling, offering to sell, making, and/or using within or into the United States the Accused Products. Salesforce’s contributory infringement included, without limitation, Saleforce’s sale and provision of the Accused Products to customers in the United States for use in practicing at least claim 1 of the ’843 Patent. The Accused Products constitute at least a material part of the invention of the ’843 Patent, are known by Salesforce to be especially made or adapted for use in infringing the ’843 Patent when used for their normal and intended purpose, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

162. Salesforce had actual or constructive knowledge of, or was willfully blind to, the existence of Outleads’s patent rights in accordance with the allegations of ¶¶ 29-37; knew or should have known that the advertisement, offer for sale, sale, and/or the facilitation of sales of the

---

[39] https://help.salesforce.com/s/articleView?id=service.web_to_case_html.htm&type=5

Accused Products would induce infringement of at least claim 1 of the '843 Patent; and/or had a subjective belief that others including end users, infringe the '843 patent, but remained willfully blind to the infringement.

163. Despite this knowledge, Salesforce continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Salesforce. Thus, Salesforce's infringement has been, and continues to be, willful and deliberate.

164. Outleads is entitled to recover damages under 35 U.S.C. § 284 to adequately compensate for Salesforce's infringement. Salesforce's ongoing infringement is willful and deliberate, as Salesforce became aware of the infringing nature of the Accused Products at least by virtue of the allegations of ¶¶ 29-37. Despite having actual knowledge of the '843 Patent, Salesforce has continued its infringing activities.

165. Outleads has been and continues to be damaged and irreparably harmed by Salesforce's infringement of the '843 Patent. This irreparable harm will continue unless this Court enjoins Salesforce.

166. Salesforce's conduct in infringing the '843 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## JURY DEMAND

167. Pursuant to Fed. R. Civ. P. 38, Outleads respectfully demands a trial by jury on all issues properly triable by a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Outleads requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

A. A declaration that Salesforce has infringed and is infringing one or more claims of the ’547 patent, either literally or under the doctrine of equivalents;

B. A declaration that Salesforce has infringed and is infringing one or more claims of the ’061 patent, either literally or under the doctrine of equivalents;

C. A declaration that Salesforce has infringed and is infringing one or more claims of the ’397 patent, either literally or under the doctrine of equivalents;

D. A declaration that Salesforce has infringed and is infringing one or more claims of the ’046 patent, either literally or under the doctrine of equivalents;

E. A declaration that Salesforce has infringed and is infringing one or more claims of the ’627 patent, either literally or under the doctrine of equivalents;

F. A declaration that Salesforce has infringed and is infringing one or more claims of the ’249 patent, either literally or under the doctrine of equivalents;

G. A declaration that Salesforce has infringed and is infringing one or more claims of the ’843 patent, either literally or under the doctrine of equivalents;

H. An Order requiring Salesforce to pay Outleads damages pursuant to 35 U.S.C. §§ 284, 285, 286, and 287 in an amount as yet undetermined caused by the foregoing acts (together with prejudgment and post-judgment interest), but no less than a reasonable royalty and/or lost profits, including but not limited to a post-judgment running royalty and/or lost profits in lieu of a permanent injunction;

I. A permanent injunction enjoining Salesforce and its employees, agents, partners, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, distributors, dealers, and all persons in active concert or participation with any of them from

committing further acts of infringement, inducing infringement, and/or contributing to the infringement of the Asserted Patents;

J. A declaration that Salesforce's infringement is and has been willful since at least as early as 2016, and enhancing damages in accordance with 35 U.S.C. § 284;

K. An award of costs and expenses pursuant to 35 U.S.C. § 284 or as otherwise permitted by law;

L. A finding that this is an exceptional case under and an award of attorneys' fees pursuant to 35 U.S.C. § 285; and

M. Such other and further relief, whether legal, equitable, or otherwise, the Court may deem just and appropriate.

Dated: August 26, 2026

Respectfully submitted,

*/s/ Elliot C. Cook*
Elliot C. Cook (VA Bar No. 76,621)
elliot.cook@finnegan.com
Deanna C. Smiley (VA Bar No. 97,234)
deanna.smiley@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street
Suite 800
Reston, VA 20190
Telephone: (571) 203-2700
Facsimile: (202) 408-4400

Attorneys for Plaintiff Outleads Inc.